IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA


THE PRUDENTIAL INSURANCE )
COMPANY OF AMERICA, )
            )
               Plaintiff, )
            )
        vs. )
            )
LISA M. DONLON and )
THERESA D. COOK, )
            )     No. 3:11-cv-0087-HRH
              Defendants. )
_____)


O R D E R

Motions in Limine;
Cross-motions for Summary Judgment

Lisa Donlon moves for summary judgment.[1]  This motion is opposed and Theresa

Cook cross-moves for summary judgment and moves to preclude Donlon from offering

any evidence of self-defense.[2]  Donlon opposes these motions and also moves for the

admission of Michael and Mark Donlon's prior testimony in lieu of live testimony, should

---

[1]Docket No. 50.

[2]Docket Nos. 38, 57 & 59.

this case go to trial [3] Donlon's motion in limine is opposed.[4] Oral argument was requested and has been heard.

Facts

This interpleader action was commenced by plaintiff The Prudential Insurance Company of America. Plaintiff insured Jason Donlon (the Insured) for $400,000 through a Servicemembers' Group Life Insurance (SGLI) policy, which was issued by plaintiff pursuant to the Servicemembers' Group Life Insurance Act (SGLIA), 38 U.S.C. §§ 1901-1929. Defendants Lisa Donlon (Donlon) and Theresa Cook (Cook) were both designated as primary beneficiaries of the Insured's SGLI benefits.[5] Donlon, the Insured's wife, was to receive 90% of any death benefits and Cook, the Insured's mother, was to receive 10%.[6]

The Insured died on October 7, 2010 as a result of multiple gunshot wounds.[7] Plaintiff paid Cook the 10% of death benefits she was designated to receive on December 16, 2010.[8] Plaintiff deposited the remaining death benefits in the amount of $360,000 into

---

[3]Docket Nos. 52, 61, & 67.

[4]Docket No. 64.

[5]Complaint in Interpleader at 3, ¶ 10.

[6]Id.

[7]Id. at ¶ 11.

[8]Id. at 4, ¶ 15.

this court's registry because Donlon had been indicted for the murder of the Insured.[9]

Under both federal common law and Alaska law, Donlon would forfeit any right to the

Insured's death benefits if she were convicted of the Insured's murder. On April 2, 2013,

Donlon was acquitted of all charges in the state case.

Even though Donlon was acquitted, she may not be entitled to the remaining death

benefits. Donlon contends that she is because she acted in self-defense when she shot the

Insured. Donlon's self-defense claim is based on the undisputed evidence that for three

days prior his death, the Insured subjected Donlon to extreme physical, sexual, and

emotional abuse.[10]

Cook however contends that Donlon is not entitled to the remaining death benefits.

Her contention is based on the undisputed evidence that the Insured was asleep on a

mattress with his back to Donlon when she shot him five times.

Donlon now moves for summary judgment arguing that she is entitled to the

$360,000 in death benefits and Cook cross-moves for summary judgment arguing that she

---

[9]An October 2010 grand jury did not recommend indicting Donlon because they found that the killing was justified. Exhibit A-1, Docket No. 51. The case was taken to a grand jury a second time in December 2010, and the second grand jury found a true bill on four charges. Exhibit A-2, Docket No. 51.

[10]Donlon has submitted extensive evidence of the abuse to which she was subjected. See Exhibit A-3-W, Docket No. 51. Cook has offered no evidence to refute this evidence. The three days of abuse began when the Insured discovered texts of a sexual nature on Donlon's phone between Donlon and Bianca Kelley, one of Donlon's co-workers.

is entitled to the $360,000 in death benefits.[11]  Cook has also moved to preclude Donlon

from offering any evidence of self-defense, and Donlon moves for the admission of Michael

and Mark Donlon's prior testimony, if this case were to go to trial.

## Discussion

As a threshold issue, the court must determine whether Donlon can offer evidence

of self-defense.  The parties disagree as to whether federal law or Alaska applies to this

question.

Cook contends that the parties stipulated that the rights to the Insured's life

insurance policy are subject to the provisions of AS 13.12.803.  However, the stipulation to

which she cites does not so provide.  Rather, it states that "if Lisa M. Donlon is convicted

of the Insured's murder, then she would forfeit any right to the Death Benefit under both

federal common law and Alaska State Statute AS 13.12.803[.]"[12]

Donlon argues that federal law applies because the insurance policy at issue is a

SGLI policy.  Courts have held that "[b]ecause [a] SGLI policy … is a federal contract issued

pursuant to a federal statute, distribution of benefits under that policy is governed by

federal law."  <u>Dachtler v. Anderson</u>, 772 F. Supp. 2d 1301, 1305 (D. Nev. 2011) (citing

---

[11]If "Donlon is found to have forfeited her right to the Remaining Death Benefit, then it would be as if she had predeceased the Insured.  Under the terms of the Plan, the Remaining Death Benefit would be payable to Theresa Cook, as the sole remaining primary beneficiary to the Plan."  Complaint in Interpleader at 5, ¶ 19, Docket No. 1.

[12]Stipulation at 2, Docket No. 10.

Prudential Ins. Co. of Am. v. Athmer, 178 F.3d 473, 475 (7th Cir. 1999); Prudential Ins. Co. of Am. v. Neal, 768 F. Supp. 195, 197–98 (W.D. Tex. 1991)). "Further, 'the controlling provisions of the SGLIA prevail over and displace inconsistent state law.'" Id. (quoting Ridgway v. Ridgway, 454 U.S. 46, 60 (1981)); see also, Brewer v. Zawrotny, 978 F.2d 1204, 1206 (10th Cir. 1992) (courts construe "the SGLIA strictly to preempt application of a state law which would result in the distribution of insurance proceeds to persons other than those designated by the insured").

The regulations governing SGLI policies provide that a beneficiary cannot recover death benefits if it is determined "in a civil proceeding" that the person "intentionally and wrongfully killed the decedent[.]" 38 C.F.R. § 9.5(e)(2)(*i*). Alaska's slayer statute, however, "encompasses intentional as well as unintentional homicides." In re Estate of Blodgett, 147 P.3d 702, 706 (Alaska 2006) (citing AS 13.12.803(f)). Thus, under federal law, Donlon would be precluded from recovering the Insured's death benefits only if she intentionally and wrongfully killed the Insured, but under Alaska law, Donlon would be precluded from recovering the Insured's death benefits even if she acted unintentionally.

Cook argues, however, that 38 C.F.R. § 9.5(e)(2)(*i*) has no application here because that regulation only applies to claims filed after November 2, 2012 and the claim at issue was filed on November 3, 2010. 77 Fed. Reg. 60304, 60305 (Oct. 3, 2012). However, the full text of the rule states that the rule applies to claims "filed on or after November 2, 2012, and

to any such claim filed before that date that has not been paid or denied as of that date."
Id. Because the claim Donlon made for the Insured's death benefits has not yet been paid,
Section 9.5(e)(2)(*i*) applies here.

The question then is whether Donlon intentionally and wrongfully killed the
Insured. Donlon argues that she did not wrongfully kill the Insured because she was acting
in self-defense. Under federal common law, in order to prevail on a claim of self-defense,
a defendant must show that "she acted with a reasonable amount of force in response to
an imminent, perceived threat." Metropolitan Life Ins. Co. v. Kelley, 890 F. Supp. 746, 749
(N.D. Ill. 1995); see also, In re Greene, 397 B.R. 688, 695 (Bankr. S.D.N.Y. 2008) (under
federal common law, a claim of self-defense requires that the defendant show that she "was
under an unlawful, imminent and impending threat of death or serious bodily injury");
Ninth Circuit Pattern Criminal Jury Instruction § 6.8 ("Use of force is justified when a
person reasonably believes that it is necessary for the defense of oneself or another against
the immediate use of unlawful force"). "Because the law pertaining to self-defense is a
matter of federal common law, [the court may also] look to state court decisions for
guidance...." United States v. Desinor, 525 F.3d 193, 199 (2d Cir. 2008) (internal citation
omitted).

Under Alaska law, to claim self-defense,[13] a defendant must show "that the circumstances [were] such that a reasonable person would believe that she was in imminent danger of death or great bodily injury. The focus here is on the circumstances as they would appear to a reasonable person." Nygren v. State, 616 P.2d 20, 22 (Alaska 1980); see also, Ha v. State, 892 P.2d 184, 194 (Alaska Ct. App. 1995) ("[A] defendant claiming self-defense as justification for the use of force must prove that he or she acted to avoid what he or she reasonably perceived to be a threat of imminent harm. A defendant's reasonable belief that harm will come at some future time is not sufficient to support a claim of self-defense or defense of others."); Paul v. State, 655 P.2d 772, 777 (Alaska Ct. App. 1982) ("before the use of deadly force in self-defense can be justified, circumstances must be sufficient to warrant a reasonable belief on the part of the accused that there exists an imminent danger of death or serious physical injury"). Thus, in order to claim self-defense, under both federal law and Alaska law, Donlon must have acted because of a threat of immediate or imminent harm.

Cook argues that Donlon's evidence of self-defense, including prior bad acts of the Insured and evidence relating to his reputation, should be excluded because there was no "imminent" threat of harm at the time Donlon shot the Insured. Cook argues that Donlon is basically asserting a "battered woman" defense, which the court in Paul implied it would

_____

[13]Alaska law specifically allows the use of deadly force to defend against death, serious physical injury, kidnaping, and sexual assault. AS 11.81.335(a).

reject.  In <u>Paul</u>, the court noted that a defendant's request for a self-defense instruction could be rejected "where there is some evidence that the defendant acted to defend himself, but no evidence of imminent peril."  <u>Paul</u>, 655 P.2d at 778 n.8.

> An example of circumstances under which self-defense instructions might be denied based on lack of imminent peril may be found in "battered wife syndrome" homicides. Typically, these cases involve a battered wife who kills her husband in his sleep.  Although in such instances there is commonly ample evidence to support a finding that the killing was motivated by fear and that the fear may have been as real and as urgent at the time of the killing as it was when the husband was awake and actually capable of immediate physical abuse, cases have uniformly refused to apply self-defense to this category of crime.  The basis for refusal has been lack of an immediate threat of harm.

<u>Id.</u>

In <u>Ha</u>, the court discussed a "battered wife" case, <u>State v. Stewart</u>, 763 P.2d 572 (Kan. 1988).  In <u>Stewart</u>,

> [t]he defendant ... had been subjected to years of horrifying treatment by her husband. He had repeatedly sexually abused her, beaten her, and threatened to kill her.  When she ran away, he found her and brought her back.  One evening, as her husband slept, the defendant heard voices repeating the phrase, "Kill or be killed."  Responding to these voices, and to "get this over with, this misery and this torment", she took a revolver and shot her husband to death.

<u>Ha</u>, 892 P.2d at 192 (quoting <u>Stewart</u>, 763 P.2d at 574-75).   "The Kansas court held that, under these facts, the defendant had failed to establish the imminency of any threatened

harm, and thus the trial judge should not have instructed the jury on self-defense." Id. The

Kansas court explained:

> "No one can attack and kill another because he may fear injury
> at some future time. The perceived imminent danger [must]
> occur ... during the time in which the defendant and the
> deceased were engaged in their final conflict.
> ....
>
> Because of [a] prior history of abuse, and [because of] the
> difference in strength and size between the abused and the
> abuser, the accused in such cases may choose to defend during
> a momentary lull in the abuse, rather than during [an active]
> conflict.... However, in order to warrant the giving of a
> self-defense instruction, the facts of the case must still show
> that the spouse was in imminent danger close to the time of the
> killing."

Id. (quoting Stewart, 763 P.2d at 577).

Cook also cites to cases from other jurisdictions which have held that a defendant

was not entitled to a self-defense instruction because there was no imminent threat of harm.

In State v. Reid, 747 P.2d 560, 564 (Ariz. 1987) (internal citation omitted), the court held that

" [e]ven if we were to hold that a history of battering and brutalizing could be a factor in

supporting the instruction of self-defense, the facts in the instant case do not rise to that

level." Reid shot her father while he slept and her "main defense centered around fear of

the victim accentuated by a long history of physical and sexual abuse and violent and

psychotic acts by the victim towards the defendant and others." Id. at 561. At the time she

shot her father, Reid was under the influence of alcohol and drugs and she "testified that

she stayed awake for two and a half hours after her father had gone to bed (and had fallen asleep) before making a search of the victim's bedroom for the gun with which she used to kill him." Id. The court explained that "[e]ven though the victim may have been capable of violence towards the defendant, we do not find that the facts indicate a reasonable fear in the mind of defendant to warrant an instruction on self-defense." Id. at 564.

In Jahnke v. State, 682 P.2d 991, 994 (Wyo. 1984), overruled on other grounds by Vaughn v. State, 962 P.2d 149 (Wyo. 1998), the defendant shot his father after lying in wait for him but claimed self-defense because he had "suffered from mental and physical abuse at the hands of his father over a long period of his life." The trial court gave the jury a self-defense instruction and the appellate court noted that "our reading of the record leaves us skeptical with respect to the validity of the defense of self-defense under these circum-stances, but the testimony of the appellant that he acted in self-defense is sufficient to justify the instruction." Id. at 1002.

In State v. Norman, 378 S.E.2d 8, 9 (N.C. 1989), the defendant shot her husband three times "in the back of the head as he lay sleeping." She claimed self-defense based on "a long history of physical and mental abuse by her husband due to his alcoholism." Id. at 9-10. On the evening of the shooting, the defendant's "husband had been beating her all day and had made her lie down on the floor while he slept on the bed. After her husband fell asleep, the defendant carried her grandchild to the defendant's mother's house. The

defendant took a pistol from her mother's purse and walked the short distance back to her home." Id. at 9. The defendant then shot her husband. Id. The appellate court "conclude[d] that the evidence introduced in this case would not support a finding that the defendant killed her husband due to a reasonable fear of imminent death or great bodily harm, as is required before a defendant is entitled to jury instructions concerning either perfect or imperfect self-defense. Therefore, the trial court properly declined to instruct the jury on the law relating to self-defense." Id.

Cook argues that similarly here because the Insured was sleeping when Donlon shot him, he posed no immediate threat of harm to her. Because Donlon killed the Insured in a preemptive strike, Cook argues that Donlon's claim that the killing was justified by self-defense fails as a matter of law and any evidence pertaining to self-defense should be excluded.

Donlon argues, however, that her evidence of self-defense should not be excluded. Donlon relies on De Groot v. United States, 78 F.2d 244 (9th Cir. 1935), in support of her argument. There, Mr. De Groot came to Abe Hansen's cabin to reclaim his wife, who had been living with Hansen, "whom the uncontradicted evidence shows to have been a powerful, hard drinking and violent tempered bully, determined to keep the woman for himself." Id. at 245. Mr. "De Groot, forty-six years of age, was 5 feet 7 inches tall, weighed 145 pounds, and was suffering from rupture. At no time did he have any weapons of his

own.  Hansen was 36 years of age, 6 feet 2 inches in height, weighing 225 pounds.  He

carried a revolver; kept a blackjack under the mattress of the bunk in his gasboat, where

he also had a rifle." Id. at 245-46.  By the time Mr. De Groot arrived at Hansen's cabin, he

was quite sick and Mrs. De Groot put him in the only bed in the cabin.  Id. at 246.  When

Hansen arrived home, he began to make threats; Hansen's threats continued the next day

and became more violent as Hansen consumed more and more alcohol.  Id.  In the evening

of the second day, Hansen and the De Groots left the cabin and took Hansen's boat to

Chichagoff. Id. at 247.  While they were going to Chichagoff, Hansen stopped the boat and

threatened to kill the De Groots.  Id.  When they got to Chichagoff, Hansen and the De

Groots boarded a boat belonging to Doc McIver.  Id.  Hansen drank heavily once they were

on the boat.  Id.  At some point in time, Hansen and Mrs. De Groot started to leave.  Id.  Mr.

De Groot thought Hansen was reaching for his gun and so Mr. De Groot grabbed a rifle

and shot and killed Hansen.  Mr. De Groot claimed that "I thought it was life or death with

me at that time because of Abe Hansen making those threats. I was tortured two days and

one night with those threats; seen him abuse my wife and threaten her." Id.  The trial judge

instructed the jury

> that even though the deceased put his hands in the front of his
> jacket or blouse in the vicinity of where the defendant claims
> he was carrying a pistol, but that defendant saw and knew that
> the deceased did not withdraw a pistol therefrom and that the
> defendant saw the deceased push the defendant's wife out of
> the cabin door with both his hands, and followed her there-

> from, and that deceased thereafter made no further hostile
> demonstration towards the defendant, then the defendant was
> not justified in shooting the deceased, and there is no
> self-defense in this case.

Id. at 248.  The Ninth Circuit held that this was error because it took

> from the jury the right to infer that Hansen when reaching for
> his gun, on the first of his last two threats to kill, recalled that
> but a few hours before Josephine had grabbed it and prevented
> [Mr.] De Groot's assassination and hence, on his final threat, he
> pushed her aside to be free from a second interference.  It
> prevented them from inferring that [Mr.] De Groot's terror,
> produced by Hansen's continued threats and an actual attempt
> to secure the woman by killing her husband, impelled him to
> believe Hansen would draw his gun and accomplish his
> previously avowed purpose, with a deliberation after the final
> threat that showed no immediate further hostile act.

Id.  The appellate court explained that the problem with the district court's instruction was

that it was "conceived in the light of what [Mr.] De Groot 'saw' and not what Hansen's acts

might impel [Mr.] De Groot to believe, or more likely, feel in the often irrational area of

human emotion."  Id.  The appellate court also noted that the instruction was "based upon

the choice of a few of the facts testified" but that it omitted "paramount facts as to the state

of [Mr.] De Groot's mind, emotions, and inferable impulses[.]"  Id.

Donlon argues that similarly here, the fact finder should be able to consider the

substantial evidence that supports her claim that at the time she shot the Insured, she

feared for her life.  This evidence includes evidence that the Insured had threatened

Donlon's life and her children's lives,[14] at times while brandishing his gun, which according

to his children he always carried. The evidence also shows that the Insured beat Donlon,

choked her, raped her, and stuck her with needles.[15] The evidence also shows that the

Insured forced Donlon and the children to watch torture videos[16] and that he hung Donlon

from a hook in the ceiling.[17] The evidence also shows that for the three days prior to his

death, the Insured basically held Donlon captive[18] and threatened that he would kill the

---

[14]See Grand Jury Testimony of Joel Miner at 29, Exhibit A-3 (Donlon said "he was going to kill me and my kids"); Donlon's Trial Testimony, Exhibit B-14 at 18, 21, 68; Docket No. 51.

[15]See SEALED SART Report, Exhibit H-1; Grand Jury Testimony of Jennifer Meyer, nurse who did sexual assault exam of Donlon, Exhibit A-5; Grand Jury Testimony of Mark Donlon, Exhibit A-8 at 9-10 (describing his dad grabbing his mom by the throat a couple times in the three days before his dad's death); Grand Jury Testimony of Michael Donlon, Exhibit A-9 at 14-15 (testifying that Donlon told him his dad had hit her, tied her wrists, and hung her from the hook in the ceiling); Donlon's Trial Testimony, Exhibit B-14 at 28-30; 36-38; Docket No. 51.

[16]See Grand Jury Testimony of Derek Degraaf, Exhibit A-7 (describing torture videos found on the Donlon computer); Grand Jury Testimony of Mark Donlon, Exhibit A-8 at 12-14 (describing watching the torture videos); Docket No. 51.

[17]See Grand Jury Testimony of Tony Wegrzyn, Exhibit A-6 at 1-4 (describing hook in the ceiling and pulley system); Donlon's Trial Testimony, Exhibit B-14 at 33; Docket No. 51.

[18]See Michael Donlon Grand Jury Testimony, Exhibit A-9 at 13-14, Docket No. 51 (testifying that Donlon was not allowed to be alone during that time); Trial Testimony of Michelyn Manrique, Exhibit B-5 at 22-23 (testifying that during those three days there was not a time when the Insured was not controlling Donlon); Docket No. 51.

children or other family members if she tried to leave.[19]  The evidence also includes the

testimony of Donlon's expert,[20] Dr. Laura Brown, who opined that

> on a more probable than not basis, ... Donlon ... was in reason-
> able fear of imminent fatal harm at [the Insured's] hands
> during the last three days of his life, and that her action in
> shooting him was taken to forestall her own death and
> potentially that of her sons. Ms. Donlon's actions were not due
> to a mental disease or defect, but rather were those of a
> reasonable person in imminent fear for her life due to the
> extremely dangerous actions and verbal threats made against
> her by Mr. Donlon.[21]

---

[19]Donlon's Trial Testimony, Exhibit B-14 at 40 (testimony that the Insured threatened that if she left, he would kill her brother and nephew); 47 (testimony that the Insured said if she told anyone about the abuse he would kill her and the boys); Docket No. 51.

[20]Donlon points out that in a 1996 U.S. Department of Justice report, it was noted that "[w]ith respect to admissibility, expert testimony on battering and its effects is admissible, at least to some degree, or has been admitted (without any discussion of the standards for admissibility), in each of the 50 states plus the District of Columbia" and that "[o]f the 19 federal courts that have considered the issue, all but three have admitted expert testimony on battering and its effects in at least some cases." The Validity and Use of Evidence Concerning Battering and Its Effects in Criminal Trials:  Report Responding to Section 40507 of the Violence Against Women Act at ix.  Cook points out that the report also states that "[e]xpert testimony has also been admitted by a substantial number of state courts in nontraditional self-defense situations, such as where a battered woman kills her batterer while he is sleeping (accepted by 29 percent of the states)", which she contends indicates that in the other 71% of the states expert testimony was not admitted.  Id. at 3.

[21]Brown Report, Docket No. 37 at 170-171.

This evidence also includes the fact that the state trial court instructed on self-defense and the jury expressly found Donlon not guilty on all four counts because of "self defense."[22] In addition, the jury was asked whether "the state has proven beyond a reasonable doubt that LISA M. DONLON did not act in self defense?", to which it answered "NOT PROVEN."[23] Donlon argues that Cook wants the fact finder to rely on a few isolated facts, namely that the Insured was sleeping when Donlon shot him but ignore all of the evidence that led up to her taking that action. Donlon insists that if a reasonable fact finder considers all the evidence, the only conclusion it can reach is that she had legal justification to use deadly force to defend herself from the Insured's abuse, rape, and kidnaping. Thus, she argues that her evidence of self-defense should not be excluded.

Donlon's evidence of self-defense will not be excluded. Cook is asserting that Donlon's killing of the Insured was wrongful and Donlon is entitled to offer evidence to show that the killing was not wrongful. Contrary to what Cook argues, there is no "bright line" rule that a defendant cannot claim self-defense if the victim was sleeping. No Ninth Circuit or Alaska case has ever so held and there are cases from other jurisdictions in which the court admitted evidence of self-defense when a battered wife claimed that she shot her husband while he was sleeping. <u>See</u>, <u>e.g.</u>, <u>People v. Yaklich</u>, 833 P.2d 758, 762 (Colo. Ct.

---

[22]Exhibit C, Docket No. 51.

[23]Exhibit D, Docket No. 51.

App. 1991) ("Other jurisdictions have defined "imminent danger" to mean something other than immediate danger and have held that a battered woman who kills her abuser during a lull in the violence is entitled to a self-defense instruction."); State v. Leidholm, 334 N.W.2d 811 (N.D. 1983)(abused wife who shot sleeping husband was entitled to self-defense instruction).

Turning then to the parties' motions for summary judgment, summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The initial burden is on the moving party to show that there is an absence of genuine issues of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). If the moving party meets its initial burden, then the non-moving party must set forth specific facts showing that there is a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). In deciding a motion for summary judgment, the court views the evidence of the non-movant in the light most favorable to that party, and all justifiable inferences are also to be drawn in its favor. Id. at 255. "[T]he court's ultimate inquiry is to determine whether the specific facts set forth by the nonmoving party, coupled with undisputed background or contextual facts, are such that a rational or reasonable [fact finder] might return a verdict in its favor based on that evidence." T.W. Elec. Service, Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 631 (9th Cir. 1987).

Cook bears the burden of proving that Donlon acted wrongfully. <u>Prudential Ins. Co. of Amer. v. Eng</u>, Case No. 95 C 6710, 1997 WL 163996, at *4 (N. D. Ill. March 27, 1997) ("The party asserting the Slayer's Rule must prove its applicability by a preponderance of the evidence."); <u>Congleton v. Sansom</u>, 664 So.2d 276, 280 (Fla. Ct. App. 1995) ("A party invoking the slayer statute ... to prevent an unconvicted killer's acquisition of property has the burden of proving that the killing was both intentional and unlawful").

Because Donlon's evidence of self-defense is not being excluded, Cook's motion for summary judgment is denied because Donlon has come forward with evidence that creates material questions of fact as to whether she wrongfully killed the Insured.

As for Donlon's motion for summary judgment, viewing the evidence in the light most favorable to Cook, a reasonable fact finder could conclude that Donlon's actions were not "objectively reasonable...." <u>United States v. Acosta-Sierra</u>, 690 F.3d 1111, 1126 (9th Cir. 2012). Under both Alaska law and federal law, Donlon had to have a reasonable belief that deadly force was necessary to protect her from imminent or immediate harm. While it may be undisputed that her actions were subjectively reasonable, a reasonable fact finder could find that they were not objectively reasonable. In deciding to not exclude Donlon's self-defense evidence, the court is not determining that Donlon was faced with an immediate or imminent threat. Rather, the court is allowing Donlon to attempt to show that she was faced with such a threat. As to the threat issue, viewing the evidence in the light most

favorable to Cook, a reasonable fact finder could conclude that Donlon was not faced with an imminent or immediate threat, even though she had been subjected to three days of extreme abuse by the Insured. Thus, Donlon is not entitled to summary judgment. There are questions of material fact as to whether or not she acted wrongfully.

As a final issue, Donlon moves to admit the prior testimony of Mark and Michael Donlon in lieu of their testimony at any trial in this case. Rule 43, Federal Rules of Civil Procedure, provides that "[a]t trial, the witnesses' testimony must be taken in open court unless a federal statute, the Federal Rules of Evidence, these rules, or other rules adopted by the Supreme Court provide otherwise." In other words, there must be some statute or rule that would permit the boys' prior testimony to be admitted in lieu of their live testimony at trial.

Donlon first argues that the boys' prior testimony could be allowed under Rule 32, Federal Rules of Civil Procedure, which allows for the use of deposition testimony at trial. Although Donlon acknowledges that the boys' prior testimony was grand jury and state court trial testimony and not deposition testimony, she argues that their testimony is no different than deposition testimony as it was taken under oath and has guarantees of trustworthiness. But, as Cook points out, Donlon ignores the portion of Rule 32 that provides that the use of deposition testimony at trial is limited to certain situations, none of which apply here.

Secondly, Donlon argues that the boys' prior testimony could be allowed under Rule 80, Federal Rules of Civil Procedure, which provides that "[i]f stenographically reported testimony at a hearing or trial is admissible in evidence at a later trial, the testimony may be proved by a transcript certified by the person who reported it." But, as Cook points out, this rule has nothing to do with whether prior testimony is admissible or not. Rather, this rule merely provides that such testimony, if admissible, must be properly certified and transcribed.

Thirdly, Donlon argues that the boys' prior testimony could be allowed under Rule 804(b)(1), Federal Rules of Evidence, which provides:

> The following are not excluded by the rule against hearsay if the declarant is unavailable as a witness:
>
> (1) Former Testimony. Testimony that:
>
> (A) was given as a witness at a trial, hearing, or lawful deposition, whether given during the current proceeding or a different one; and
>
> (B) is now offered against a party who had--or, in a civil case, whose predecessor in interest had--an opportunity and similar motive to develop it by direct, cross-, or redirect examination.

But, as Cook points out, Rule 804(b)(1) only applies if the witness is unavailable and there has been no showing that either of the boys is unavailable to testify at a trial in this case.

Donlon also suggests that 18 U.S.C. § 3509 would permit the admission of the boys' prior testimony. Section 3509 sets forth the rights of child victims and witnesses and

provides that children may testify either by 2-way closed circuit television or by videotaped deposition. But, as Cook points out, Section 3509 does not provide that a child's prior testimony in a transcribed form may be admitted instead.

Finally, Donlon argues that the boys' prior testimony could be allowed under Rule 807, Federal Rules of Evidence, which provides:

> Under the following circumstances, a hearsay statement is not excluded by the rule against hearsay even if the statement is not specifically covered by a hearsay exception in Rule 803 or 804:
>
> (1) the statement has equivalent circumstantial guarantees of trustworthiness;
>
> (2) it is offered as evidence of a material fact;
>
> (3) it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts; and
>
> (4) admitting it will best serve the purposes of these rules and the interests of justice.

The boys' prior testimony has guarantees of trustworthiness because it was taken under oath and it is offered as evidence of material fact. It might be more probative than them testifying in person because of the passage of time.[24] And, it <u>could</u> be in the interests of justice to not make the boys relive the last few days of their father's life again. But, Donlon

---

[24]The importance of these witnesses is not diminished, as Donlon suggests, because this will be a bench trial. The court is entitled to make its own credibility decisions in this case.

has not shown that it <u>would</u> be in the interests of justice to admit the boys' prior testimony.

Donlon's motion as to her sons' testimony is denied with leave to renew if, in the opinion

of the sons' licensed counselor, their testimony would be detrimental to their mental health.

<u>Conclusion</u>

Cook's motion in limine[25] is denied as is her cross-motion for summary judgment.[26]

Donlon's motion for summary judgment[27] is denied, and Donlon's motion in limine[28] is

denied with leave to renew.

DATED at Anchorage, Alaska, this <u>2nd</u> day of June, 2014.

<u>/s/ H. Russel Holland</u>
United States District Judge

---

[25]Docket No. 38.

[26]Docket No. 57.

[27]Docket No. 50.

[28]Docket No. 61.