IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

THE PRUDENTIAL INSURANCE )
COMPANY OF AMERICA, )
)
                  Plaintiff, )
)
vs. )
)
LISA M. DONLON and THERESA D. COOK, )
) No. 3:11-cv-0087-HRH
                 Defendants. )
_____)

FINDINGS OF FACT
AND
CONCLUSIONS OF LAW

      The issues raised in this case were tried to the court without a jury, commencing February 2, 2015. The court has since received written closing arguments from the parties.[1] Based upon the parties' statement of uncontested facts,[2] the trial testimony, exhibits admitted at trial, and the parties' closing arguments, the court now makes its findings of fact and conclusions of law.

Proceedings

      This case commenced upon the filing of a complaint in interpleader by the Prudential Insurance Company of America ("Prudential").[3] It is undisputed that Jason Donlon ("Jason") was covered by a Servicemembers' Group Life Insurance ("SGLI") policy (G-32000), which

---

[1]Docket Nos. 130, 131, and 132.

[2]Docket No. 98.

[3]Docket No. 1.

Findings of Fact and Conclusions of Law                  - 1 -

Prudential issued pursuant to the Servicemembers' Group Life Insurance Act ("SGLIA"), 38 U.S.C. §§ 1965-1980A. In its complaint, Prudential alleged that it was unable to determine factually or legally, who, as between defendants Lisa M. Donlon ("Lisa") and Theresa D. Cook ("Theresa"), was entitled to 90% of the death benefits which Prudential was ready and willing to pay on account of the death of Jason Donlon. Theresa admitted all of the allegations of Prudential's complaint and prayed for judgment establishing her right to the life insurance proceeds offered by Prudential.[4] Similarly, Lisa admitted the essential allegations of Prudential's complaint. Lisa asserts an affirmative defense. Lisa contends that the death of Jason was "justified and not felonious."[5] Lisa seeks a court order entitling her to the insurance proceeds offered by Prudential.

The case being at issue, the parties entered into a stipulation with Prudential that required Prudential to deposit with the registry of this court $360,000.00 plus interest representing the insurance proceeds which were in dispute between Theresa and Lisa.[6] The funds in question were deposited with the court and, on June 27, 2011, Prudential was dismissed with prejudice and without costs from this case,[7] leaving Theresa and Lisa to litigate entitlement to the insurance proceeds.

As reflected by the parties' June 2011 stipulation,[8] Lisa was under indictment as a result of the death of Jason. The parties agreed that if Lisa were convicted of Jason's death, she would have thereby forfeited any right to the insurance proceeds in question; and if Lisa

---

[4]Answer to Complaint in Interpleader by Theresa D. Cook, Docket No. 4.

[5]Lisa Donlon's Answer to Complaint in Interpleader at 3, Docket No. 7.

[6]Docket No. 10.

[7]Docket No. 11.

[8]Docket No. 10 at 2.

were to have forfeited the insurance proceeds, it was agreed that under the Prudential policy, death benefits would be payable to Theresa. Based upon a report from the parties,[9] proceedings in this court were stayed by order of July 21, 2011,[10] because of the underlying criminal litigation. By a series of orders,[11] this stay of proceedings was continued until March 29, 2013. By status report of April 3, 2013,[12] the parties reported that, as a consequence of trial in State v. Donlon, No. 3PA-10-34387-CR, Lisa was found not guilty in connection with the death of Jason.

A scheduling and planning order for the pretrial development of this case was entered May 30, 2013.[13] In due course, the pretrial development of the case was completed and motions were filed and determined by the court.[14] Thereafter, the court called upon the parties to certify the case ready for trial.[15] By order of August 7, 2014,[16] the case was set for trial beginning February 2, 2015. Concurrent with the trial setting, the court entered its Order for Pretrial Proceedings and Final Pretrial Conference.[17] The parties fully complied with that

---

[9] Docket No. 13.

[10] Docket No. 15.

[11] Docket Nos. 17, 19, 21 and 23.

[12] Docket No. 24.

[13] Docket No. 28.

[14] Docket No. 73.

[15] Docket No. 74.

[16] Docket No. 85.

[17] Docket No. 91.

order. The parties filed a statement of uncontested facts,[18] which is incorporated into the court's findings. The parties also filed a joint statement of issues,[19] their respective witness lists,[20] their respective exhibit lists,[21] and their respective trial briefs.[22]

Opening statements having been waived, Theresa's Exhibits 1 through 24 were admitted by stipulation, and Theresa rested. Over four days, the court heard testimony from Lisa's witnesses and rebuttal testimony on behalf of Theresa.[23]

## Issues Presented

The parties' joint statement of issues accurately captures the single issue presented by this case: did Lisa intentionally and wrongfully kill Jason? In their statement of issues, the parties agreed that Theresa has the burden of establishing, on a more likely than not basis, that Lisa intentionally and wrongfully killed Jason. In this regard, the parties have in substance agreed that Theresa must, by a preponderance of the evidence, negate the contention that Lisa acted in self-defense. Lisa contends that her actions were justified in reliance upon AS 11.81.335.

## Applicable Law

"Because [a] SGLI policy ... is a federal contract issued pursuant to a federal statute, distribution of benefits under that policy is governed by federal law." Dachtler v. Anderson, 772 F. Supp. 2d 1301, 1305 (D. Nev. 2011) (citing Prudential Ins. Co. of Am. v. Athmer, 178

---

[18]Docket No. 98.

[19]Docket No. 99.

[20]Docket Nos. 101 and 103.

[21]Docket Nos. 100 and 102.

[22]Docket Nos. 109 and 110.

[23]Transcript of Trial by Court, Vols. I-V, Docket Nos. 125-129.

Findings of Fact and Conclusions of Law - 4 -

F.3d 473, 475 (7th Cir. 1999); Prudential Ins. Co. of Am. v. Neal, 768 F. Supp. 195, 197–98 (W.D. Tex. 1991)). Regulations promulgated pursuant to the SGLIA provide:

> (e)(1) The proceeds payable because of the death of an individual insured under Servicemembers' Group Life Insurance or Veterans' Group Life Insurance ("decedent") shall not be payable to any person described in paragraph (e)(2) of this section. A Servicemembers' Group Life Insurance Traumatic Injury Protection benefit payable under § 9.20(j)(3) shall not be payable to any person described in paragraph (e)(2) of this section.
>
> (2) The persons described in this paragraph are:
>
> (i) A person who is convicted of intentionally and wrongfully killing the decedent or determined in a civil proceeding to have intentionally and wrongfully killed the decedent....

38 C.F.R. § 9.5(e).

Section 9.5(e)(2)(i) establishes two criteria which call into play different concepts: a mental state ("intentionally") and a societal judgment ("wrongfully"). Here, as to the first component, we focus upon Lisa's state of mind. There is no dispute that "intentionally" should be given its ordinary meaning of "on purpose."[24] See United States. v. Gallegos, 613 F.3d 1211, 1214 (9th Cir. 2010) (quoting United States v. Iverson, 162 F.3d 1015, 1022 (9th Cir. 1998)) (when a regulation "'does not define a term, we generally interpret that term by employing the ordinary, contemporary, and common meaning of the words'"). As to the second component, we consider society's view of the nature of the homicide. The parties disagree as to whether "wrongfully" affords a slayer the opportunity to establish justification.

Based upon the rule-making history with respect to § 9.5, Theresa argues that it does not. The proposed regulation only included the term "intentionally" and did not include the term "wrongfully." 77 Fed. Reg. 60304 (Oct. 3, 2012). Theresa argues that the term

---

[24]Random House Webster's College Dictionary 701 (1991).

Findings of Fact and Conclusions of Law - 5 -

"wrongfully" was "added to reinforce the underlying public policy that one who intentionally kills another should not benefit from the act."[25]

Theresa reads too much into the limited rule-making history upon which she relies. The term "wrongfully" was added to § 9.5(e) because it "speak[s] to the heinous aspect of the slayer's act that violates public policy." Id. But, it was also added to make § 9.5(e) consistent with 38 C.F.R. § 3.11. Id. Section 3.11 governs dependency and indemnity compensation for veterans' survivors and "provides that '[a]ny person who has intentionally and wrongfully caused the death of another person is not entitled to pension, compensation, or dependency and indemnity compensation ... by reason of such death.'" Lofton v. West, 198 F.3d 846, 847-48 (Fed. Cir. 1999) (quoting 38 C.F.R. § 3.11). In Lofton, the surviving spouse, who had shot and killed her veteran husband, "argue[d] that the regulation [was] overbroad because it could prohibit the payment of benefits to a surviving spouse that mistook her husband for a burglar and mistakenly shot and killed him." Id. at 851. The court rejected that argument, concluding that "[i]n such a case, the defense of mistake would undoubtedly be available to the surviving spouse, and the killing would therefore not be considered wrongful." Id.; see also, Robinson v. Gibson, Case 12–3199, 2014 WL 2319254, at *3 (Vet. App. May 30, 2014) (holding that "[b]ecause ... the record of proceedings contains no evidence that Mrs. [Robinson]'s actions were the result of an accident, self-defense or that she was insane at the time of the killing, the Board's factual finding of an intentional and wrongful killing is plausible and not clearly erroneous"). Because § 9.5(e) was modeled on Section 3.11, it follows that § 9.5(e), like Section 3.11, affords a slayer the opportunity to establish justification.

---

[25]Theresa Cook's Closing Argument at 3, Docket No. 130.

Lisa claims self-defense as a justification for killing Jason. Under federal common law, in order to prevail on a claim of self-defense, a defendant must show that "she acted with a reasonable amount of force in response to an imminent, perceived threat." Metropolitan Life Ins. Co. v. Kelley, 890 F. Supp. 746, 749 (N.D. Ill. 1995); see also, In re Greene, 397 B.R. 688, 695 (Bankr. S.D.N.Y. 2008) (under federal common law, a claim of self-defense requires that the defendant show that she "was under an unlawful, imminent and impending threat of death or serious bodily injury"). "Because the law pertaining to self-defense is a matter of federal common law," the court may also "look to state court decisions for guidance...." United States v. Desinor, 525 F.3d 193, 199 (2d Cir. 2008).

Lisa calls our attention to AS 11.81.335(a), which provides:

> Except as provided in (b) of this section, a person who is justified in using nondeadly force in self-defense under AS 11.81.330 may use deadly force in self-defense upon another person when and to the extent the person reasonably believes the use of deadly force is necessary for self-defense against
>
> (1) death;
>
> (2) serious physical injury;
>
> (3) kidnapping, except for what is described as custodial interference in the first degree in AS 11.41.320;
>
> (4) sexual assault in the first degree;
>
> (5) sexual assault in the second degree;
>
> (6) sexual abuse of a minor in the first degree; or
>
> (7) robbery in any degree.

"[T]o employ self-defense a defendant must satisfy both an objective and subjective standard; he must have actually believed deadly force was necessary to protect himself, and

his belief must be one that a reasonable person would have held under the circumstances." Weston v. State, 682 P.2d 1119, 1121 (Alaska 1984) (emphasis added).

The parties are in agreement that the burden of proof is on Theresa to negate Lisa's claim of self defense. As a practical matter, and for purposes of this case, the latter means that Theresa has to convince the court by a preponderance of the evidence that objectively it was not reasonable for Lisa to believe that she was in imminent danger of death, serious physical injury, kidnapping, or sexual assault, any of which would have justified the use of deadly force as a defense.

## Findings of Fact

1. Jason and Lisa were married on July 4, 1995, in Greenville, South Carolina. The marriage produced three sons: M1 (1997), M2 (1999), and M3 (2002).

2. Jason was a United States Marine from the ages of 18 through 22, and was then a member of the Alaska Army National Guard until his death.

3. At the time of his death, Jason was on leave without pay from the Alaska Army National Guard. Jason would receive nominal pay when he attended a medical appointment in lieu of drill. The Alaska Army National Guard, unlike the majority of states, covers a soldier 365 days a year, including for non-drill activity that causes a soldier's death.

4. At the time of this death, Jason was insured by a SGLI policy issued by Prudential. Lisa is the primary beneficiary for 90% of any death benefits under the policy and Theresa, Jason's mother, is the primary beneficiary for 10% of any death benefits.

5. On October 3, 2010, Jason found sexually explicit text messages on Lisa's cell phone between Lisa and B.K. Jason believed that Lisa and B.K. were having a romantic relationship.

6. In the early morning hours of October 4, 2010, Jason woke up the family, showed the children the text messages, and demanded that Lisa pack her belongings because he intended to take Lisa to B.K.'s house. Theresa told Jason that he should not take Lisa to B.K.'s house in the middle of the night. Nonetheless, Jason drove the family to B.K.'s house in Anchorage from Butte, Alaska, brought the family to B.K.'s door, woke up B.K. and R.K., and showed B.K. and R.K. the text messages on Lisa's phone. R.K. offered to let Lisa stay at her and B.K.'s home, and Jason left with the children and Lisa's cell phone, which Jason never gave back to Lisa.

7. Later on October 4, 2010, Jason, along with the children, went to Eagle River Elementary where Lisa worked. When they arrived at Eagle River Elementary, Jason approached Lynn Lasher, Lisa's immediate supervisor. Jason showed Ms. Lasher the text messages between Lisa and B.K. Ms. Lasher advised that the text messages were not work-related and refused to fire or punish Lisa. Jason asked for Ms. Lasher's supervisor because Jason would not accept her position, and Jason was referred to Colleen Kelley whose office is located at the Anchorage YMCA building.

8. Jason, the children, and Lisa went to Anchorage, where Jason contacted Colleen Kelly. After Jason showed Colleen Kelley the text messages on Lisa's phone and Colleen Kelly refused to fire Lisa, Jason asked to speak with Colleen Kelley's supervisor, Larry Parker.

9. Jason met with Larry Parker and showed him the text messages between Lisa and B.K. Jason asked Mr. Parker to fire Lisa and B.K. Mr. Parker advised Jason that the messages were after work hours and not a concern of the YMCA.

10. Beginning October 4, 2010, and over a total of three days, Jason badgered Lisa for the "truth" about the text messages. Lisa repeatedly told Jason that there had been a few kisses and nothing more. Jason became increasingly agitated, angry, and abusive when he got little or no further explanation from Lisa and no satisfaction from his efforts to involve others in his concerns.

11. On October 4 and 5, 2010, Jason repeatedly threatened to kill Lisa.

12. On October 6, 2010, Jason and Lisa picked up Lisa's paycheck at the YMCA building in Anchorage, which Lisa cashed later that day.

13. On October 6, 2010, Jason, while in the company of Lisa, purchased Singer heavy duty sewing needles and a bottle of Everclear from the Carr's store in Eagle River at 3:04 p.m. using Jason's Carr's Safeway membership card.

14. On October 6, 2010, the family watched torture movie clips on Jason's computer prior to going to dinner at Evangelo's Restaurant in Wasilla.

15. While at Evangelo's Restaurant, both Jason and Lisa possessed concealed hand guns. Jason regularly carried a .45 caliber pistol.

16. On the evening of October 6, 2010, Jason threatened to kill Lisa and the three Donlon boys.

17. Beginning October 4, 2010, and during a total of three days, Lisa was subjected to ever-increasing threats and violence at the hands of Jason. The results of the physical abuse to which she was subjected is depicted in Exhibit H-2. Lisa testified – and forensic nurse Meyer largely confirmed Lisa's claim – that she was raped, strangled, assaulted, whipped, slapped, and punched in the days preceding Meyer's examination of Lisa on October 7, 2010. Nurse Meyer could not confirm Lisa's testimony that she had been strangled to unconsciousness or that Jason had stuck a sewing needle in Lisa's breast and

ankle. Police officers, however, believed Lisa's explanations of her injuries, and the results of a search warrant executed on the cabin in which Lisa and Jason had been living produced all of the paraphernalia that Lisa had described and which Jason had used to torment Lisa on October 4, 5, and 6, 2010. Lisa's testimony that Jason sprayed rubbing alcohol on Lisa's breasts and endeavored to ignite it is undisputed.

18. There is no evidence that Jason ever abused the Donlon boys. All three of the Donlon boys testified at trial. The younger boy was attentive and responsive to questions. The oldest Donlon boy appeared disengaged but generally responsive. The middle Donlon boy was concerned over the fact that he had not been asked to testify at his mother's trial on criminal charges. None of the boys evinced any fear of Jason. Although Jason appears to have sometimes endeavored to shield the boys from his abuse of Lisa, at least two of the boys were present much of the time October 4, 5, and 6, 2010. The boys went to school on October 5 and 6, but they clearly had some sense of what was going on and generally corroborated Lisa's description of what was going on.

19. Because of Jason's threats to kill her and the boys, Lisa believed that she and the boys were in mortal danger. Lisa's testimony is almost entirely undisputed and corroborated. Lisa's testimony is entirely credible.

20. On the morning of October 7, 2010, while Jason was in bed asleep, Lisa slipped out of bed and found Jason's .45 caliber pistol. Lisa admitted that at approximately 6:30 a.m., she shot Jason five times in the back with a .45 caliber handgun, killing him.[26]

---

[26] Amended Answers to First Request for Admissions, Cook Exhibit 1 at 3-4. By her answer to Request No. 1, Lisa expressly admitted that at approximately 6:30 a.m., on October 7, she shot Jason five times with a .45 caliber handgun. By her answer to Request No. 2, Lisa expressly admitted that Jason was asleep at the time she shot him; and by her answer to Request for Admission No. 3, Lisa expressly admitted that she shot Jason in the back.

21. Immediately after shooting Jason, Lisa made a 911 call to police, who promptly responded.

22. At the time of Jason's death, Lisa and Jason were residing in a small cabin (a shed) on property owned by Theresa and Jason's stepfather. The cabin was some 30 feet away from Theresa's residence. The cabin was served by a landline telephone that Lisa employed to make the 911 call. Another landline was available in Theresa's residence.

23. At the time of Jason's death, M1 had already left for school, but M2 and M3 were still at home.

24. The facts of Jason's death were presented to a first grand jury which declined to return an indictment. A second grand jury indicated Lisa for first-degree and second-degree murder and for manslaughter. A trial jury acquitted Lisa of all three charges, and in each instance the verdict read "not guilty / self-defense."

25. Laura Brown, Ph.D., Lisa's expert, testified, based upon well known research and her knowledge of the circumstances prior to Jason's death, that "someone's [sic] going to die."[27] Dr. Brown testified that in situations such as this, it is usually the male who kills the female. Dr. Brown was asked:

> Q. ...what conclusion did you reach in this case regarding [Lisa's] subjective mental state on October the 7th, 2010?
>
> A. Within a reasonable degree of psychological certainty, my opinion was that [Lisa] was in imminent fear of death at the hands of her husband, Jason....[28]

Later in her examination, Dr. Brown was asked:

> Q. ...on a more probable than not basis, what opinion can you offer this Court on whether [Lisa] wrongfully and intentionally shot [Jason]?

---

[27] See Trial Transcript Vol. V at 21 (Feb. 6, 2015), Docket No. 129.

[28] Id. at 15-16.

> A. That's an interesting question. What I would say on a more probable than not basis, [Lisa] was acting to defend herself and to protect herself and her children from being killed on the day that she shot [Jason].[29]

26. Two aspects of Dr. Brown's opinions are critical. First, the entire focus of Dr. Brown's testimony was on Lisa's <u>subjective</u> state of mind. Dr. Brown was not evaluating the objective, factual situation that confronted Lisa at the time she picked up Jason's pistol. Second, the fact that psychologists who evaluate domestic violence can opine with greater or lesser degrees of certainty that someone will die simply does not answer the question: was the use of deadly force at the time Lisa shot Jason objectively necessary? The fact that Lisa believed, that Dr. Brown believed, and that this court believes that Lisa really believed Jason's death threats does not by itself answer the critical question of whether or not Lisa's shooting of Jason was wrongful.

27. In the minutes, and probably several hours, prior to Jason's death, Lisa was objectively in no immediate life-threatening danger. Instead of slipping out of bed, finding Jason's pistol, and shooting him, Lisa could have slipped out of bed, taken Jason's pistol (and her own), gone next door to Theresa's house, and called the police who no doubt would have responded. Had police been shown (as they were) the results of the physical abuse to which Lisa had been subjected by Jason, he would no doubt have been arrested; and the situation would have been defused without further harm to anyone. Although Lisa subjectively saw the situation otherwise, to an objective observer, once Lisa had possession and control of Jason's pistol, she was in a position to control the situation, even if her exiting the cabin had awakened Jason. Lisa's training in the use of small firearms enhanced her ability to protect herself once she had control of Jason's pistol, and Lisa's relatively good relationship with

---

[29]<u>Id.</u> at 21.

Theresa would have afforded an additional level of safety once Lisa reached Theresa's house to make a 911 call.

28. On the morning of October 7, 2010, Lisa intentionally shot and killed Jason.

29. On the morning of October 7, 2010, Lisa reasonably believed that deadly force was necessary to protect herself.

30. On the morning of October 7, 2010, a reasonable person would not have believed that deadly force was necessary because Lisa was under no immediate threat of death, serious physical injury, kidnapping, or sexual assault. Theresa has established by a preponderance of the evidence that Lisa's shooting of Jason was not objectively reasonable.

31. For purposes of 38 C.F.R. § 9.5(e)(1), (2)(i), Lisa intentionally and wrongfully shot and killed Jason.

## Conclusions of Law

1. This court has both diversity jurisdiction, 28 U.S.C. § 1332, and federal question jurisdiction, 28 U.S.C. § 1331, of this case.

2. Lisa, a primary beneficiary under Jason's SGLI policy, is disqualified from receiving benefits under Jason's policy by 38 C.F.R. § 9.5(e)(1), (2)(i) because the court has determined in these civil proceedings that Lisa intentionally and wrongfully killed Jason.

3. As the sole remaining primary beneficiary of Jason's SGLI policy, Jason's mother, Theresa Diane Cook, is entitled to receive the insurance proceeds with interest now on deposit with the clerk of court.

4. The clerk of court shall enter judgment in favor of Theresa Diane Cook in the amount of $361,423.49 plus accrued interest. The funds necessary to satisfy this judgment are on deposit with the clerk of court and shall be disbursed 31 days following the entry of this judgment if no notice of appeal is filed. If a notice of appeal is filed, the clerk of court

shall retain the funds now held in the registry of the court pending the receipt of a mandate from the court of appeals and a further order of this court.

DATED at Anchorage, Alaska, this  7th day of May, 2015.

/s/ H. Russel Holland
United States District Judge